Next case this morning is 4090833, Bd. of Education, Homewood-Flossmoor Community High School District v. Bd. of Trustees. So for the appellant, James Bartley. You are here, sir? Yes. And for the appellee, Ralph Lowenstein. You are here? I am. Mr. Bartley, you may proceed. Thank you. May it please the Court. Counsel. Is my mic on? Yes, you're going. Thank you. May it please the Court. Counsel. Jim Bartley on behalf of Homewood-Flossmoor Community High School. This case involves a question really of law and simply statutory interpretation in the application of a grandfathering statute to the employment contract of the superintendent of schools of Homewood-Flossmoor who retired in 2008. The issue is whether the salary increases given to the superintendent in her last two years of employment after she elected to retire are exempt from the additional contribution imposed upon school districts by virtue of Public Act 9404. Teachers' pensions are calculated based upon the number of years of service and their final average salary. Their final average salary for purposes of pension calculation is the average of the highest four-year salaries in the last ten consecutive years. Public Act 9404 stated that if there were any salary increases provided to a retiring teacher in excess of 6 percent from the prior year's salary that were used for purposes of the calculation for the retirement benefit, then the employing board would have to make an additional contribution to the teacher's retirement system equal to the present value of the increase in benefits caused by the salary increases in excess of 6 percent. But then the statute specifically went on to say that there can be no required additional contributions for any salary increases that were paid under contracts that were existing as of June 1, 2005. Dr. Murray had a 2001-2006 multi-year employment agreement. In addition to that, the school district had in place a board policy or procedure, Procedure Policy 2413. Procedure 2413 provided administrative benefits including retirement incentives, similar to those provided to teachers in collective bargaining agreements, that sort of thing. Both parties agreed that those pay raises pursuant to 2413 were done pursuant to that section, right? Yes, they were pursuant to Policy 2413. The issue is whether or not Policy 2413 formed part of the employment contract of Dr. Murray from 2001 to 2006. Could a board policy be changed? Yes, it certainly could. Could a contract be changed during the term of the contract? No, the contract could not be changed during the term of the contract without mutual agreement or mutual assent, of course. Nor, in my opinion, can the policy be changed in terms of the creation of the right to the benefit to the employee. That comes under the O'Doyle case, which you would see, where the Supreme Court specifically stated that if there's an employment policy that creates an employment right, the employer cannot unilaterally make an alteration to that benefit because there's no additional consideration. What case involves an employee handbook, the circumstance in the Duda-Lau case where this first came out, where there is in addition an existing employment contract, written contract? I do believe that there, and I can't recall the case. I think it's the Marshall Field case or the May case where the executive had an employment contract and there were also oral representations and an employment policy that the court held essentially formed part of the contract deal. What court was that? First District Appellate Court, I believe, Your Honor. And I'm sorry I did not cite that case you've asked. I believe there is a case that is there. Well, to be blunt, what sense does that make and why should we adopt such a policy? That is, Duda-Lau dealt with at-will employees, and I can understand the whole employee handbook circumstance under that situation. This is a case where we have a written contract. Part of written contracts between high officials such as the superintendent of schools, the school district, is to put forth in the contract all the terms of the contract. You're essentially arguing to us that, well, yeah, there's this written contract, but, you know, we've got all these policies and other stuff that's also part of the contract even though it's not written in there. Is that right? Yes, that's correct, Your Honor. Why should we accept such an argument and what good sense does that make as a matter of policy? Because as a general practice, quite often employee benefits are provided through employment policies. For example, if you look at the policy right here, 2413, you'll see that vacation is provided for, health insurance is provided for, retirement benefits are provided for. What about Dr. Murray's contract? Did it contain any information about that? Yes, in part. And did that information, to the extent it differ, was that which part governed her? Her written contract or these policies? The written contract would govern her to the extent that those provisions were contrary to the provisions in the administrative policy. Why should we, as a matter of law, say that contracts between superintendents of schools and the school district don't contain all the contractual provisions between those parties? This isn't some janitor we're talking about. I don't think that the court should say that. Well, isn't that... The court should not. Isn't that what you want us to... Not in all cases, Your Honor. Well, not in all cases, but in this case. Yes, in this case. So how would you explain why it would apply in this case and not in the next one? Because the undisputed facts in this case are very clear through Dr. Murray's affidavit and, as a matter of fact, the Board's minutes accepting her retirement. And that is, at the time that she entered into her employment contract, she was aware of the policy. She considered it as part of her contract. 2413? Yes. She was aware of it. She relied on it, and she considered it part of her contract. Now, I would also say, and I just want to make this point, because this was raised in the briefs. Their argument is that the policy was not incorporated into the contract by virtue of paragraph 21 of the contract, which provides that the superintendent shall have all other and additional benefits that are provided to all other certified staff. And TRS simply says, well, that doesn't incorporate it because not all other certified staff get the benefits of policy 2413. Therefore, it's not incorporated by virtue of the express language of her contract. That's an error because that's a misinterpretation of that clause. As we point out, the clause provided to all other certified employees essentially means each and every other certified employee. As the chief executive, the intention of that clause, and that's borne out by her affidavit that's undisputed, as well as the Board action, was that they intended that to be the case, that the chief executive gets what's in her contract as well as any benefits that are given to any other certified staff. They're arguing that it doesn't cover her. It's not incorporated directly because it doesn't apply to, quote, all other certified staff. Well, we really only have two groups of certified staff, teachers under the collective bargaining agreement and administrators. So the concept that this clause meant that everyone else had to have the benefit would mean that she could not get the benefits of the collective bargaining agreement because they might not be provided to other administrators. And that's clearly an erroneous interpretation. What is meant by all other is essentially a most favored nations type clause, a provision that if other certified staff members obtain a benefit, then she does. Now, the odd part about this is to take it this way and say, well, okay, she had a five-year agreement, and she elects to retire two years in the future, and she doesn't get the benefit because it's not incorporated, but all other administrators do and the teachers do in the collective bargaining agreement. That's the result of what they're saying, unless you want to say that, yes, the Board had a contractual obligation to pay that money to her under her contract. And I believe they did, and I believe that's why it's grandfathered, because the intention of the legislature was to simply say this. Look, if a school board has a contractual obligation to make these payments when somebody elects to retire in the future that existed on June 1, 2005, then those payments are exempt from the additional contribution. And if you look at it by virtue of Dildabo, O'Doyle, the idea that, yes, it is incorporated, but also the fact that it's directly incorporated in our judgment based upon paragraph 21 of the contract, you have to come to the conclusion that, yes, the school board had the contract obligation. When Dr. Murray elected to retire on April 13, 2006, still during her admittedly exempt contract, could the school board have said, no, we're not paying you those two salary increases provided by the policy? I don't think they could. They had a contract obligation to do that, arising from the policy that existed at the time she signed the contract and she relied upon, and the incorporation clause, paragraph 21. So if the board had the contract obligation to pay it on June 1, 2005, and Dr. Murray had the contract right to receive the payment on June 1, 2005, then I believe that clearly the legislature intended that the additional salary be exempt from those contributions by virtue of that grandfathering clause. The TRS in their brief and elsewhere, they don't address that at all. They say that the, they admit that it's an exempt contract, 0206, and they admit the policy that provides the benefit. They don't say whether they think we had a contract obligation to pay it or not, but they simply say that the payments didn't arise under the 0106 exempt contract. They were part and parcel of the 0106 contract because we had a contract obligation to pay it on that date, if she elected to retire. Their argument that this could go on forever is without any merit at all, because first of all, it ends on 2011, no matter what, by virtue of the statute. Secondly, in this particular case, Dr. Murray elected to take the benefit and retire during the term of her multi-year exempt contract. So I believe it should be looked at like this. I believe the court should say, did the school board have a contract obligation on June 1, 2005, to make these payments to Dr. Murray in her last two years? Whether that arises from the policy or the contract or the policies incorporated in the contract, as I believe it is, or becomes part of the employment contract, either way you cut it. If the legislature's intent was to say, we're not going to bind school boards to additional payments if they're already contracted to make them on June 1, 2005, then that's the way it should go, and I believe that's the clear intent of the statute. So we would ask the court to find that the decision of the TRS board is incorrect here and contrary to the statute in the grandfathered clause. Thank you very much. Thank you, counsel. You're welcome. Mr. Lowenstein. May it please the court, counsel. My name is Ralph Lowenstein, and I'm here on behalf of the Board of Trustees of the Illinois Teachers Retirement System. Mr. Bartley and I do agree on what the issue is here. The issue is whether or not Superintendent Murray was paid pursuant to, received a retirement incentive pursuant to an exempt contract. What we disagree about is the answer to that question, because we believe the answer is clearly no. I think that in aid of the court interpreting this particular provision as it applies to these facts, it's important for you to understand sort of the background of the legislation that was passed. Under the Teachers Retirement System pension code, a member of the system may get credit for a salary increase up to 20% for purposes of increasing their retirement annuity year over year. What that led to was boards of education typically, or in many cases, giving retirement incentives to employees that were about ready to retire. And the effect of that was to greatly increase the retirement annuity for members and shift that cost to Teachers Retirement System. The legislature, in response to this, passed Public Law 94-4, in which they added subsection F to 16158. And that, basically what that said, as Mr. Barclay mentioned earlier, that if a salary increase exceeded 6%, that the board of education, the employer, would be charged for the actuary equivalent of retirement incentives above 6%. It was designed to discourage employers from giving large retirement incentives or, if they chose to do so, to shift that cost back to the employer. That was subsequently amended a year later to add subsection G to give some limited exceptions to that. The one we're dealing with here has to do with contracts or collective bargaining agreements. Retirement incentives paid pursuant to contracts or collective bargaining agreements that were, in effect, amended or renewed prior to June 1, 2005. Now we look at the particular facts in this case. Superintendent Murray was employed under a multi-year contract, a performance-based contract, provided for under 10-23.8 of the school code. And that provision basically limits a performance-based contract to five years. That was an exempt contract. If she had been paid her retirement incentives under that contract, they would have been exempt. But that's not what happened. Superintendent Murray elected to retire and gave notice to the board of education in April of 2006. And her retirement date was the end of the 2007-2008 school year. That exempt contract expired on June 30. Pursuant to Section 18 of that exempt contract, it provided that if the board didn't give notice of intent not to renew, there would be a new one-year contract. So she had a new one-year contract for 2006-2007. She received a 20% retirement incentive under that new contract. The school code provides in 10-21.4 that in the case of a superintendent, if notice of intent is not given to non-renew prior to April 1, that there is a new contract by operation of law. At the end of the 2006-2007 school year, they didn't give a notice of intent not to renew. So she had a new contract by operation of law for 2007-2008. She was paid a second retirement incentive of 20% under that new contract. The situation in this case is that the board of education argues that this administrative policy, 24-13, which both councils do agree that's the basis for paying her the retirement incentives, was first of all incorporated in her 2001-2006 contract. Clearly that's not the case. There's nothing about retirement incentives in that exempt contract. The argument by council for the board of education is that Section 21 of that contract incorporates the administrative policy. What does it say? Well, I'm going to read that to you. What that says is the superintendent shall be allowed such other privileges, leaves, and fringe benefits, not specifically enumerated, as are extended to all other certified personnel. As are extended to all other certified personnel. 24-13 didn't give benefits to all other certified personnel. They were restricted to administrative personnel. Who is certified personnel? Well, it would include teachers. It would include counselors. So 24-13 didn't include them? It only included administrative personnel. And I don't think there's any dispute about that. So clearly the policy wasn't incorporated by virtue of Section 21 because the administrative policy was restricted to administrative personnel. Do you agree that that policy is part of an underlying contract even though it's not contained in the contract? Well, that's really not any of our business because whether or not they had some obligation to pay her or not, regardless, doesn't make it fall within the Section 16-158 for several reasons that I'm going to mention to you. One question you did ask earlier, whether or not that policy could be changed, clearly that policy could have been changed by the Board of Education. They weren't under any obligation to keep that policy. It certainly could have been changed before. So your answer to the question, the policy is not part of the contract, part of the collecting bargaining agreement? Well, it wasn't part of the individual employment contract here. Whether or not they had an independent obligation to pay her or not really doesn't concern teachers' retirement system. Did her contract address retirement? No, it did not. There was nothing in her employment contract about retirement incentives. The second argument made by counsel is that this is somehow an exempt stand-alone policy. But there are several problems with that argument as it applies to these facts. If you look at the language of 16-158G, it exempts contracts and collective bargaining agreements entered into, renewed or extended prior to June 1, 2005. It doesn't say anything about policies. It certainly could have. That applied to individual employment contracts and contracts by operation of law and collective bargaining agreements by its very terms. Secondly, and I think that this is important and something that I'm sure that counsel for the Board of Education would prefer that you overlook, coming back to what I said earlier, Superintendent Murray was employed under a multi-year performance-based contract pursuant to 10-23.8. That provision limits the number of years of the performance-based contract to five years. If you were to say that the policy was a stand-alone contract which was potentially exempt, that would mean that in Superintendent Murray's case, she had a seven-year contract. And that's clearly contrary to what 10-23.8 provides. In some cases, it could be up to ten years because if you entered into a contract in 2001 and you didn't receive the payments until 2011, that would be a ten-year contract. And that's clearly contrary to the provision in the school code. In addition to that, Teachers Retirement System did promulgate some regulations which, under very, very restricted circumstances, addressed the issue of policies. And counsel has cited that policy in his brief. It's 1650.484 and particularly subsection A. And that provides as follows. We clearly had the authority to promulgate that regulation both under the Administrative Procedures Act and there's some specific language in 16-158F which invites us, it says, pursuant to guidelines. It says, members not covered by collective bargaining agreements or employment contracts, the system will accept employment policies as evidence of a contractual agreement under which salary increases paid and sick leave granted shall be exempt from employer contributions under 16-158F. The problem for Superintendent Murray and for the school district is that she was covered under an employment contract. She clearly was covered under an employment contract, so this particular policy doesn't help her in any respect. In fact, quite to the contrary, it makes clear that the policy, regardless of what effect it might have had between the parties, couldn't be exempt under 16-158. Something that I did not address in her brief, and I won't mention here if the court doesn't want me to, and the reason I didn't address it in her brief was because this policy came up in his reply brief, we do have a specific employer bulletin further interpreting 1650.484. And that's found in Employer Bulletin 06-03. And that says employees working under an employment contract that are not governed by the collective bargaining agreement, which clearly in this case would apply to Superintendent Murray, will receive an exemption from employer contributions for the 05-06 school year. So even if somehow you say that this is a stand-alone contract, it isn't exempt. We have issued a policy dealing with rare circumstances under which incentives paid under policies might be considered to be exempt. But even under our interpretation and under the policy, it does not apply to Superintendent Murray. I think for all of these reasons, the payments made to Superintendent Murray were not paid pursuant to an exempt contract, and we would respectfully ask the court to affirm the decision of the Board of Trustees and of the Circuit Court. Okay, thank you, Counsel. Mr. Bartley, any rebuttal, sir? Yes, briefly. Okay. Two things. First, the argument that she did not receive these additional payments under the exempt contract because she was employed after the expiration of her multi-year contract under a new one-year contract. It's a misinterpretation of what is meant by paid under. It is the right to the payment that arises and becomes a contract obligation under the exempt contract, irrespective of whether or not that increased salary is going to be paid subsequent to the expiration date of that contract. As a matter of fact, that happens all the time. Retirement incentives are provided under an existing contract that says, if you elect to retire permanently two years in the future, then we will give you these benefits. Well, of course, that contract expires and they're on another contract, but the right to the benefit arises under the exempt contract. I also was taken by the fact that Counsel mentioned again that whether or not we had an obligation, a contract obligation to pay, doesn't concern them or isn't part of it. Of course it is. That's exactly what the legislature did. You know, in that exemption clause, when they use the word contract, they don't say written contract, contract by a policy, oral contract. They use the word contract. In other words, the concept here is really, to me, very clear. If the employer has a contract obligation to pay on June 1, 2005, and if the employee has a contract right to receive the payment on June 1, 2005, then those payments are exempt, even though they're made in the future, in the retirement years. As far as the idea of shifting the cost and the intention of this statute, the legislature could very well have simply said, we won't allow any pension credits for salaries in excess of 6%. No, the teachers' union won't allow that. They want 20% salary increases. They're fighting for this. So what do they do? They come in and they say, well, we'll allow salary increases for pension up to 20%, but if you give more than 6%, then the employer is going to have to pay this additional penalty, leaving, of course, the employers to fight with the unions and the employees and everything else as to whether their increases are going to be over 6%. But aside from that, that is the idea of the shifting. Yes, it was a shift to the employers, but there's an exemption to that shifting, and that's the grandfather clause. And that applies when there was a contract obligation to pay and a contract obligation to receive on June 1, 2005, and that's precisely what we have here. Whether you consider it incorporated into the contract, which we certainly do, or you consider it a contract obligation that arose by a policy that was there and relied upon by the employee, either way, it's a contract obligation. When you look at the language in 158G or F that says we exempt salary increases arising under contracts or collective bargaining agreements existing on or before June 1, 2005, they're talking about contract in its global sense. You read it in its customary sense. You don't say only written contracts or only collective bargaining agreements. No, contract, a contract is a contract. So we believe that the TRS got it wrong here. We know that they want the money. We know that they're fighting for every dime they can get, but we believe that from a legal perspective we're fighting for every dime we can get, too, to run the school, and we believe we were exempt and that we should receive a refund of that money that we've already paid them and that they were wrong in saying that it didn't arise under the contract. Simply because she's employed under a new contract didn't mean the best salary because there's no salary in these new contracts that he says arose. They just simply are there. What's the salary? Well, the salary is set by the prior exempt contract that existed on June 1, 2005. So I would ask the court to consider this. I think it's covered in the briefs, and thank you very much. Okay, thank you, counsel.